UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

R. SHANE FORREST,

                Plaintiff,

      -vs-

CLOVER GROUP, INC.                            Civil Case No. 23-557
348 Harris Hill Road
Buffalo, NY 14221                                **COMPLAINT**

CLOVER MANAGEMENT, INC.               **JURY TRIAL DEMANDED**
348 Harris Hill Road
Buffalo, NY 14221

CLOVER CONSTRUCTION
MANAGEMENT, INC.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER CONSTRUCTION MANAGEMENT
WEST CORP.
348 Harris Hill Road
Buffalo, NY 14221

THE CARLYLE GROUP
1001 Pennsylvania Avenue, NW, Ste. 220 S
Washington, DC 20004

CARLYLE CLOVER PARTNERS, L.P.
1001 Pennsylvania Avenue, NW, Ste. 220 S
Washington, DC 20004

CARLYLE CLOVER PARTNERS 2, L.P.
1001 Pennsylvania Avenue, NW, Ste. 220 S
Washington, DC 20004

CLOVER COMMUNITIES FUND I, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

1

CLOVER COMMUNITIES FUND II, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND III, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND IV, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND V, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND V, LLC
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

MICHAEL L. JOSEPH
3200 Washington Road
West Palm Beach, FL 33405

ALLISON H. JOSEPH PENDLETON
143 Windsor Avenue
Buffalo, NY 14209

RICHARD A. GREENSPAN
106 Ranch Trail West
Buffalo, NY 14221

ROBERT D. JACK
361 Reiber Road
Renfrew, PA 16053

                                                  Defendants.

**INTRODUCTION**

1.      This is an action for injunctive relief, declaratory judgment, equitable relief, and damages filed by Plaintiff R. Shane Forrest by and through his attorneys, Advocates for Justice, Chartered Attorneys, pursuant to the Fair Housing Act, 42 U.S.C. § 3617, and U.S. Department of Housing and Urban Development ("HUD") regulations, 24 C.F.R. §§ 100.70(d)(1) and 100.400(c)(6).

2.      As set forth in detail below, Defendants Clover Group, Inc.; Clover Management, Inc.; Clover Construction Management, Inc.; Clover Construction Management West Corp.; The Carlyle Group; Carlyle Clover Partners, L.P., Carlyle Clover Partners 2, L.P.; Clover Communities Fund I, L.P.; Clover Communities Fund II, L.P.; Clover Communities Fund III, L.P.; Clover Communities Fund IV, L.P.; Clover Communities Fund V, L.P.; Clover Communities Fund V, LLC; Michael Joseph; Allison Joseph Pendleton; Richard Greenspan; and Robert Jack intentionally engaged in illegal race-based housing discrimination by refusing to develop housing in or near Black neighborhoods in violation of 42 U.S.C. § 3604(a), 24 C.F.R. § 100.70(b), North Carolina General Statutes § 41A-4(a)(1), Tennessee Code § 4-21-601(a)(1), and Virginia Fair Housing Law § 36-96.3(A)(1); evidence of the same is inarguably documented in audio recordings.

**PARTIES**

3.      Plaintiff R. Shane Forrest resides in Greensboro, North Carolina, and was employed as a Development Director for Clover Construction Management West Corp. ("Clover West") from September 20, 2021 to December 5, 2022. Plaintiff performed work for Defendant Clover West under the direction of executives that worked for Defendant Clover West, Defendant Clover

3

Management, Inc. ("Clover Management"), and Defendant Clover Construction Management, Inc. ("Clover Construction").

4. Defendant Clover Group Inc. ("Clover Group") is a domestic corporation organized and existing under the laws of the State of New York that owns and manages market-rate age-restricted multi-family rental housing in New York, Pennsylvania, Indiana, Ohio, Kentucky, and Missouri.

5. Defendant Clover Management is a domestic corporation organized and existing under the laws of the State of New York that manages leasing and operations of market-rate age-restricted multi-family rental housing, with headquarters at 348 Harris Hill Road, Buffalo, New York 14221.

6. Defendant Clover Construction is a domestic corporation organized and existing under the laws of the State of New York that specializes in the development and construction of market-rate age-restricted multi-family rental housing, with headquarters at 348 Harris Hill Road, Buffalo, New York 14221.

7. Defendant Clover West is a foreign corporation organized and existing under the laws of the state of Delaware specializing in the development and construction of market-rate age-restricted multi-family rental housing, with headquarters at 348 Harris Hill Road, Buffalo, New York 14221 (collectively referred to with Clover Group, Clover Management, and Clover Construction as the "Clover Entities").

8. Defendant The Carlyle Group ("Carlyle") is a global private equity firm with headquarters at 1001 Pennsylvania Avenue, Ste. 220 S, Washington, D.C. 20004. Carlyle partners with Clover Entities on developing Clover Entities' market-rate age-restricted multi-family rental housing and has decision-making authority over Clover Entities' site selection decisions.

Defendant Carlyle is an owner of Carlyle Clover Partners, L.P., and Carlyle Clover Partners 2, L.P.

9. Defendant Carlyle Clover Partners, L.P. ("Carlyle Clover") is a foreign entity organized and existing under the laws of the Cayman Islands with headquarters at 1001 Pennsylvania Avenue, Ste. 220 S, Washington, D.C. 20004. Upon information and belief, Carlyle Clover has an ownership interest in Clover Entities.

10. Defendant Carlyle Clover Partners 2, L.P. ("Carlyle Clover 2" and collectively with Defendant Carlyle and Defendant Carlyle Clover, as "Carlyle Defendant")) is a foreign entity organized and existing under the laws of the Cayman Islands with headquarters at 1001 Pennsylvania Avenue, Ste. 220 S, Washington, D.C. 20004. Upon information and belief, Carlyle Clover 2 has an ownership interest in Clover Entities.

11. Defendant Clover Communities Fund I, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

12. Defendant Clover Communities Fund II, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

13. Defendant Clover Communities Fund III, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

14. Defendant Clover Communities Fund IV, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

15. Defendant Clover Communities Fund V, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

16. Defendant Clover Communities Fund V, LLC is a limited liability company organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments. Defendant Clover Communities Fund V, LLC is referred to collectively with Defendant Clover Communities Fund I, L.P., Defendant Clover Communities Fund II, L.P., Defendant Clover Communities Fund III, L.P., Defendant Clover Communities Fund IV, L.P., and Defendant Clover Communities Fund V, L.P. as "Clover Community Funds")

17. Defendant Michael Joseph resides in West Palm Beach, Florida, and is an owner and President of Clover Entities.

18. Defendant Allison Joseph Pendleton resides in Buffalo, New York, and is the Chief Operating Officer of Clover Entities.

19. Defendant Richard Greenspan resides in Buffalo, New York, and is the Vice President of Clover Entities.

20. Defendant Robert Jack resides in Renfrew, Pennsylvania, and is Executive Vice President of Development for Clover Entities and was Plaintiff's direct supervisor.

## JURISDICTION AND VENUE

21. Jurisdiction over Plaintiff's claims is conferred upon this Court by 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

22. Venue is proper in the United States District Court, Western District of New York, pursuant to 28 U.S.C. § 1391(b) because Defendants have and continue to conduct business in the Western District of New York.

## STATEMENT OF FACTS

**A. PLAINTIFF'S BACKGROUND AND HOW HE CAME TO BE EMPLOYED BY CLOVER ENTITIES**

23. Defendant Clover Entities are owned and operated by Defendant Joseph, who has purchased and developed more than 700 million dollars in residential and commercial properties since 1989. Since approximately the year 2000, Defendant Clover Entities have built their business around developing and operating market-rate age-restricted apartment buildings. Clover Entities' properties are marketed as affordable senior living apartment communities.

24. Today, Defendant Clover Entities owns and manages dozens of such properties in New York and five other states.

25. Plaintiff is a 56-year-old resident of Greensboro, North Carolina, who has worked in the real estate industry for 28 years. He is a licensed real estate broker in the State of North Carolina and has held executive leadership positions at multiple firms throughout his almost three-decade career.

26. Plaintiff began working for Defendant Clover Entities on September 20, 2021, Plaintiff initially reported to David P. Archibald until Archibald's death, at which time Plaintiff began reporting to Defendant Jack.

### B.     PLAINTIFF'S RESPONSIBILITIES AT CLOVER ENTITIES

27. Plaintiff's responsibilities included identifying real property for sale in North Carolina, Tennessee, and Virginia, and submitting these proposed acquisitions with details (including demographic data for the surrounding area) to Defendant Clover Entities' leadership.

28. The proposed sites were then vetted by Archibald and Defendant Greenspan, and later by Defendant Jack and Defendant Greenspan.

29. As stated earlier, every prospective development site submitted to Clover Entities' leadership for approval needed to include a demographics report that identified the race of persons living near the subject property.

30. In addition to Archibald and Defendants Greenspan and Jack, the Carlyle Defendants, and Defendants Clover Community Funds vetted and approved selection of all development sites.

### C.     CLOVER ENTITIES' ILLEGAL RACE-BASED HOUSING DISCRIMINATION PRACTICES

31. Plaintiff discovered in or about February 2022 that Defendant Clover Entities required inclusion of racial demographics with each proposed development site because Defendant Clover Entities illegally reject potential development sites in or even near Black neighborhoods.

32. Defendant Clover Entities use a set of written and unwritten site selection criteria to find proposed development sites.

33. Defendant Clover Entities' written site selection criteria are lawful and appropriate measures for a company that builds market-rate age-restricted apartment buildings. For example,

8

Defendant Clover Entities required proposed sites to be of a certain minimum size (total acreage). They also required minimum thresholds for certain demographics data for populations living within, and properties located within, radiuses of three, five, and/or 10 miles from proposed sites; these included the number of persons age 65 and older, the average household income, and the median home value.

34. Defendant Clover Entities' unwritten site selection criteria are illegal and rely upon the percentage of Black people living within both a three-mile radius and a five-mile radius of a proposed site to determine whether the site is suitable for Clover Entities' purposes.

35. Defendant Clover Entities' executives and employees referred to the percentage of Black people living within a three-mile radius and a five-mile radius of a proposed site as the "Canadian Factor."[1]

36. Defendant Clover Entities' executives regularly rejected development of prospective sites on the basis of the percentage of Black people living nearby according to the demographic reports, and expressly refused to build market-rate age-restricted apartment buildings in "heavily Black areas."

37. Plaintiff was never given a specific threshold indicating Clover Entities' preferred tolerance of Black people living in the vicinity of a prospective development site, but was instead instructed to avoid Black areas altogether.

38. In particular, throughout the company it was well known and repeated to Plaintiffs by his supervisors, that Greenspan would not develop in Black neighborhoods. This was the

---

[1] "Canadian," as used by the Clover Entities, is a euphemism for "n*gger."

9

unwritten rule and a dispositive factor. He was also told to stop "wasting time" on Black neighborhoods because they would never pass for investment approval.

39. In fact, among Defendant Clover Entities' 48 market-rate age-restricted apartment buildings in operation as of this filing, the average percentage of Black people living within a three-mile radius of these properties is just 6.77%, which is less than half the national Black population percentage (13.6%).

40. Defendant Clover Entities' race-based site selection criteria are often the most important selection criteria for Defendant Clover Entities' executives. Specifically, the "Canadian Factor" is the key metric for Defendant Clover Entities.

41. Plaintiff first learned of Defendant Clover Entities' "Canadian Factor" and use of the term "Canadians" from Archibald in discussions about properties that Plaintiff had found and recommended for development by Clover Entities. When Archibald used the terms "Canadians" and "Canadian Factor" in those conversations, he indicated that he was relaying the feedback that he had received from other Clover Entities' leadership about Plaintiff's recommended development sites.

42. For months after he began work for Defendant Clover Entities, Plaintiff was ignorant of what Archibald and Defendant Clover Entities' leadership meant through the use of the terms "Canadians" and "Canadian Factor."

43. In or about February 2022, Archibald expressly asked Plaintiff if he understood the meaning of "Canadian Factor."

44. When Plaintiff told Archibald that he understood the term "Canadians" to mean citizens of Canada, explained Plaintiff misunderstood and that "Canadians" referred to Black

10

people, and that the "Canadian Factor" refers to the percentage of Black people living near a proposed site.

45. Archibald did not approve of Defendant Clover Entities' reliance on the "Canadian Factor" to vet and reject proposed sites. He directed Plaintiff to rely on Defendant Clover entities written site selection criteria, and expressly not to consider race in his site selection process (which Plaintiff would have done regardless of Archibald's direction).

46. Archibald told Plaintiff that he would vigorously support and defend any of Plaintiff's proposed sites that Defendant Clover Entities' leadership rejected on the basis of the surrounding Black population.

47. Archibald also expressed his intent to staff Defendant Clover Entities' development team with new, ethical employees to represent enough of a force within Defendant Clover Entities that the company would have no choice but to stop its racist and illegal housing discrimination practices.

48. On or about June 7, 2022, at an in-person meeting of development staff at Defendant Clover Entities' headquarters in Buffalo, New York, Defendant Greenspan announced that Defendant Clover Entities has decided not to develop land in Maryland because the "Canadian" population is too high in that state.

49. In addition to Plaintiff and Archibald, Ryan Archibald, Elizabeth Ernat, Russell Caplin, and Defendant Jack were present for this announcement.

50. Plaintiff consistently ignored Defendant Clover Entities' race-based site selection criteria during his employment with Defendant Clover Entities because it is expressly illegal and is also unethical and immoral, and adherence to the illegal policy could have resulted in revocation of Plaintiff's North Carolina real estate broker's license.

51. On or about June 22, 2022, Archibald died suddenly. Defendant Clover Entities' promoted Defendant Jack to the position of Executive Vice President of Development.

52. Defendant Jack had been employed by Clover Entities for about seven years prior to this promotion and had himself been responsible for implementing the Canadian Factor in his previous position as a Development Director.

53. For the next five months (until he was terminated), Plaintiff reported to Defendant Jack, who consistently—and without reasonable justification—rejected all but three of the many proposed sites submitted by Plaintiff.

54. In regularly scheduled meetings between Plaintiff and Defendant Jack, Defendant Jack would often make statements such as, "I can't present this site to [Defendant Greenspan]—there are too many Canadians," or similar statements.

55. Defendant Jack frequently referred to Black people as "Canadians" and the Black population as the "Canadian Factor," and regularly rejected Plaintiff's proposed sites because too many Black people lived nearby per the demographics reports that Plaintiff was required to produce and submit to Defendant Jack.

56. Defendant Jack was aware of Clover Entities' race-based exclusion policy, and willfully upheld and enforced the same.

57. Defendant Clover Entities chose not to develop market-rate housing in or near Black neighborhoods because, as Emily Brady, Clover Entities' Executive Vice President of Operations put it, the Black community has "a lot of trouble paying their rent," and so Defendant Greenspan does not "want to put [Defendant Joseph] in that position where [Defendant Greenspan] chooses land that's in an urban area that may have some type of issue with residents paying their rent."

58. The Carlyle Defendants and Defendants Clover Community Funds were aware, or should have been aware, that Defendant Clover Entities illegally relied upon race as a factor in rejecting sites for development.

59. The Carlyle Defendants and Defendants Clover Community Funds actively participated in review of each proposed development site, and vetted and approved each site before selection or rejection.

**D.  PLAINTIFF REPORTED CLOVER ENTITIES' ILLEGAL SITE SELECTION PRACTICES TO EXECUTIVE LEADERSHIP**

60. As a licensed real estate broker, Plaintiff knew Defendant Clover Entities' race-based discriminatory site selection criteria and practices were illegal under federal and state laws. During his discussion with Archibald in or about February 2022, in which Archibald explained the meaning of Canadians and Canadian Factor to Plaintiff, Plaintiff told Archibald that race-based housing site selection criteria are illegal. In the same conversation, Plaintiff told Archibald he refused to use race as a site selection factor. Archibald welcomed and agreed with Plaintiff's position on this matter.

61. Archibald's successor, Defendant Jack, did not share Archibald's views on Defendant Clover Entities' "Canadian Factor," and instead chose to enforce the illegal policy for sites Plaintiff proposed in North Carolina, Virginia, and Tennessee.

**E.  PLAINTIFF REFUSED TO PARTICIPATE IN CLOVER ENTITIES' ILLEGAL SITE SELECTION PRACTICES**

62. Throughout his employment with Defendant Clover Entities, Plaintiff consistently refused to use race as a criterion in any housing site selection decision on behalf of Defendant Clover Entities or any other party.

63. Defendant Jack routinely expressed to Plaintiff his frustration over Plaintiff's consistent recommendation of sites in or near Black neighborhoods given that such sites expressly

violated Defendant Clover Entities' firm rule of not developing housing in or near Black neighborhoods.

### F. CLOVER ENTITIES RETALIATED AGAINST PLAINTIFF FOR REPORTING ITS DISCRIMINATORY HOUSING PRACTICES AND FOR REFUSING TO PARTICIPATE IN SUCH ACTIVITY

64. Plaintiff risked his livelihood and professional reputation to do the right thing by (1) reporting to Archibald, an executive of Defendant Clover Entities, that race-based housing discrimination is illegal, (2) that he refused to use race as a site selection factor in his work, and (3) consistently submitting prospective development sites to Defendant Clover Entities' leadership that complied with Clover Entities' written and housing site selection criteria, but not Defendant Clover Entities' unwritten and illegal race-based housing site selection criteria.

65. As a result, Defendant Clover Entities fired Plaintiff in a blatant and illegal act of retaliation.

66. Plaintiff's termination occurred on December 5, 2022, about five months after he began working for Defendant Jack, who willfully subscribes to Defendant Clover Entities' racist and illegal housing site selection criteria.

67. Plaintiff was terminated over the phone by Defendant Jack, who explained that the termination was the result of Plaintiff's inability to identify and recommend sites suitable to Defendant Clover Entities for housing development.

## FIRST CLAIM FOR RELIEF
### Retaliation in Violation of the Fair Housing Act

68. Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

69. Plaintiff was an employee of Defendants.

70. Plaintiff identified that Defendants' market-rate age-restricted multi-family rental housing developments were dependent on discriminatory race-based site selection criteria and practices that violate the law, specifically, 42 U.S.C. § 3604(a), 24 C.F.R. § 100.70.

71. Plaintiff made legally protected disclosures when he reported to Defendants that their discriminatory race-based site selection criteria and practices were illegal and needed to change.

72. Plaintiff also refused to participate in Defendants' discriminatory race-based site selection practices.

73. Defendants terminated Plaintiff's employment because of Plaintiff's refusal to participate in Defendants' discriminatory race-based site selection process.

74. As a result of Defendants' willful and unlawful conduct in violation of 42 U.S.C. § 3617; 24 C.F.R. § 100.70(d)(1); and 24 C.F.R. § 100.400(c)(6); Plaintiff suffered grievous, extensive, and continuing damages, including but not limited to humiliation, embarrassment, reputational harm, lost wages, lost benefits, liquidated damages, attorneys' fees, and the costs of this action.

## SECOND CLAIM FOR RELIEF
### Retaliation in Violation of the New York Human Rights Law

75. Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

76. Plaintiff was an employee of Defendants.

77. Plaintiff identified that Defendants' market-rate age-restricted multi-family rental housing developments were dependent on discriminatory race-based site selection criteria and practices that violate the law, specifically New York State Human Rights Law (Executive Law § 296).

78. Plaintiff made legally protected disclosures when he reported to Defendants that their discriminatory race-based site selection criteria and practices were illegal and needed to change.

79. Defendants expressed anger and animus toward Plaintiff for his protected disclosures.

80. Plaintiff also refused to participate in Defendants' discriminatory race-based site selection practices.

81. Defendants expressed anger and animus toward Plaintiff for his refusal to participate in Defendants' discriminatory race-based site selection practices by recommending the development of a site that did not comply with Defendants' discriminatory race-based site criteria.

82. Defendants terminated Plaintiff's employment because of Plaintiff's protected disclosures and because of Plaintiff's refusal to participate in Defendants' discriminatory race-based site selection process.

83. As a result of Defendants' willful and unlawful conduct in violation of New York State Executive Law § 296(7), Plaintiff suffered grievous, extensive, and continuing damages, including but not limited to humiliation, embarrassment, reputational harm, lost wages, lost benefits, liquidated damages, attorneys' fees, and the costs of this action.

### THIRD CLAIM FOR RELIEF
**Discrimination**

84. Defendants' race-based site selection criteria and practices that prevented Defendants from developing market-rate age-restricted multi-family rental housing in or near Black neighborhoods expressly violate the Fair Housing Act, 42 U.S.C. § 3604(a).

85. The Fair Housing Act provides that "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages," 42 U.S.C. § 3613(c)(1) (emphasis added).

86. By its text, the Fair Housing Act authorizes punitive damages against all Defendants.

87. As a result of Defendants' willful and unlawful conduct in violation of 42 U.S.C. § 3604(a), Plaintiff is authorized to receive punitive damages.

### **REQUEST FOR ATTORNEY AND EXPERT FEES AND COSTS**

88. If Plaintiff prevails, he is entitled to an award of attorney and expert fees and costs.

### **DEMAND FOR TRIAL BY JURY**

89. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court will grant his judgment containing the following relief:

A.    Declare the aforementioned actions of Defendants to be in violation of federal and state statutes and regulations;

B.    Grant Plaintiff an amount to be determined at trial, in no event less than $5,000,000.00, for back pay and front pay lost benefits, pain, and suffering;

C.    Impanel a jury to hear Plaintiff's claims;

D.    Costs and disbursements of this action, including attorney fees; and

E.    Such other and further relief as this Court deems necessary and proper.

Dated: June 16, 2023

Respectfully Submitted,

*/s/ Nathan D. McMurray*
Nathan D. McMurray
ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
225 Broadway, Suite 225
New York, New York 10007
Phone: (212) 285-1400
Cell: (716) 517-5506
nmcmurray@advocatesny.com